**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | | |
|---|---|---|
| TAYSIR SHEIKA, | : | |
| | : | Civil Action No. 08-3678 (FSH) |
| Petitioner, | : | |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| MICHELLE R. RICCI, et al., | : | |
| | : | |
| Respondents. | : | |

---

**APPEARANCES:**

Taysir Sheika, Pro Se
# 263137/SBI # 753320B
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Steven E. Braun, Esq.
Office of the Passaic County Prosecutor
401 Grand Street
Paterson, NJ 07505-2095
Attorney for Respondents

**HOCHBERG, District Judge**

Petitioner Taysir Sheika, a prisoner currently confined at the New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are Administrator Michelle Ricci and the Attorney General of New Jersey.

For the reasons stated herein, the petition must be denied.

**BACKGROUND**

**A.    Factual Background**

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division ("Appellate Division").[1]

> On the night of June 5, 1992, Russell Ferguson was robbed and fatally beaten.

> * * *

> Ferguson was a Paterson firefighter. On the night of the incident, he and his friends, Joseph Parkin, Charles Parkin, and David Prosser, imbibed substantial quantities of alcohol at Rosie's Tavern. Ferguson was extremely inebriated, so much so that the bartender refused to continue serving him. At some point, Ferguson left the tavern alone.

> Although the exact chronology of events is not entirely clear, Ferguson ultimately encountered defendant, Abdul, Ahmadnour Ayoub, Isaam Atshan, Raaid Thabata and Marilyn Carrerro, who had gathered outside a nearby restaurant. Ferguson appeared helplessly intoxicated. Taking advantage of that condition, defendant and Abdul threw the victim to the ground. Defendant grabbed Ferguson's firefighter's medallion while Abdul relieved the victim of his wallet. In a statement given to the police upon his arrest, Atshan described how defendant repeatedly kicked Ferguson as he lay helpless on the sidewalk. Although Atshan disavowed that statement at trial, he admitted that he observed defendant and Abdul flee from the scene following the robbery.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Thabata and Carrero departed in Carrero's automobile.  They subsequently encountered defendant, Abdul and Atshan several blocks away.  Defendant proudly displayed Ferguson's gold chain, noting that he had "mugged" the victim.  Thabata and Carrero drove the three men to a nearby destination.

Meanwhile, Ferguson was able to make his way to Rosie's Tavern.  According to Prosser, Ferguson appeared intoxicated and disheveled.  Ferguson told Parkin "they got me," but was initially unable to explain what happened.  He later related that he had been kicked and punched in the back and groin, but he could give no further details concerning the crime. Ferguson complained of abdominal pain, but refused medical assistance.

The Parkins drove Ferguson to his house.  With their assistance, he was able to exit from the car, but he was "bent over" and could not stand erect.  After helping Ferguson undress, the Parkins departed. Ferguson's wife, Cecelia, was not present, having moved out of the house three weeks earlier to assist her invalid mother.

Cecelia returned to the house the next morning. Unable to push the door more than a few inches, she peered in the crack and observed Ferguson's bare shoulder.  The emergency squad was immediately summoned.  They found Ferguson's body propped against the door.  A search of the house revealed that the bathroom toilet was cracked and leaking.  Feces were found in and around the bathtub.  Ferguson was pronounced dead at the scene.

Dr. Lyla Perez performed the autopsy.  She found that Ferguson's tenth and eleventh ribs were fractured, and that the decedent had suffered three deep lacerations in his spleen.  Perez also found a deep hemorrhage of the muscles surrounding Ferguson's back. Although Ferguson suffered from advanced cirrhosis of the liver, Perez unequivocally concluded that the "laceration[s] of the spleen with contusions and intra-abdominal hemorrhage ... and rib fractures" constituted the cause of death.  Perez also determined that the injuries were consistent with the decedent having been repeatedly kicked in the area of his ribs. Perez discounted the possibility that Ferguson's death

3

was a result of a fall or contact with a toilet. Such
an accident would have resulted in large bruising on
the outside of the skin. Perez emphasized that such an
occurrence would not cause a ruptured spleen.

The police investigation revealed that defendant,
Atshan, Thabata, and Omar Ayoub (Ahmadnour's brother)
met on the afternoon of the day Ferguson's body was
discovered. Defendant sold the gold chain he had
stolen from Ferguson to Omar, but retained the
firefighter's medallion. Defendant, Abdul and Atshan
divided the proceeds. Omar subsequently discarded the
chain upon learning that the police were investigating
Ferguson's death.

On June 8, 1992, the police arrested Abdul on an
unrelated charge. While transporting Abdul to the
police station, one of the officers mentioned the
investigation relating to Ferguson. Abdul
spontaneously replied, "you must be talking about the
chain." The police then apprised Abdul of his
constitutional rights. Abdul thereafter confessed his
participation in the crime.

The police arrested defendant later that day. He
too was advised of his constitutional rights. After
initially disclaiming any involvement, defendant
admitted that he had participated in the robbery and
might have kicked Ferguson while relieving the victim
of his gold chain and medallion. Defendant stated that
he had given the medallion to his girlfriend. She
later brought the item to the police station at
defendant's request.

State v. Sheika, 337 N.J. Super. 228, 234-36 (App. Div.), certif.

denied, 169 N.J. 609 (2001).

B.   **Procedural History**

A Passaic County Grand Jury returned an indictment charging

defendant, and co-defendant Charif Abdul with three counts of

violating New Jersey state law: felony murder, contrary to

N.J.S.A. 2C:11-3a(3) and 2C:2-6 (count one); robbery, contrary to

4

N.J.S.A. 2C:15-1 and 2C:2-6 (count two); and conspiracy to commit robbery, with Charif Abdul, contrary to N.J.S.A. 2C:5-2 and 2C:15-1. Ahmadnour Ayoub was charged with receiving stolen property and tampering with evidence.

Following a jury trial, on June 3, 1994, Petitioner was found guilty of all counts, but was found guilty of the lesser included offense of second-degree robbery, not first degree robbery, on the robbery charge. He was sentenced to sixty years imprisonment with a 30-year parole disqualifier. Co-defendant Charif Abdul was acquitted of felony murder and first-degree robbery, but was found guilty of the lesser included offense of second-degree robbery, and guilty of conspiracy.

A direct appeal was filed, but prior to the appeal being decided, Petitioner filed for post-conviction relief ("PCR"). On June 19, 1998, the PCR motion was denied. A notice of appeal appealing both the judgment and conviction, and denial of PCR was filed on August 3, 1998.

On February 9, 2001, the Superior Court of New Jersey, Appellate Division ("Appellate Division") affirmed the judgment of conviction but remanded to the Law Division on various issues concerning trial counsel's performance. On the issues that were affirmed, Petitioner filed a petition for certification with the New Jersey Supreme Court, which was denied on July 16, 2001. On the issues that were remanded, a hearing was conducted on

December 21, 2001, and concluded on November 8, 2002.  On November 12, 2002, the issues remanded from the motion for PCR concerning counsel were denied.

The record is unclear as to further procedural history.  On May 25, 2005, the New Jersey Supreme Court denied certification on a matter concerning Petitioner.  It also appears that Petitioner filed a PCR motion regarding ineffective assistance of counsel, which he withdrew in May of 2006.

Petitioner's first habeas petition was filed on July 22, 2008.  Petitioner was advised of his rights pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), on September 4, 2008.  After an "all-inclusive" petition for habeas corpus was filed on September 19, 2008, an Order to Answer was issued and Respondents filed an Answer to the petition on January 9, 2009.  The available state court record was filed on August 20, 2009, and September 1, 2009.

C.   **Petitioner's Claims**

Petitioner cites fourteen grounds for relief:

(1)   Prosecutorial misconduct denied Petitioner a fair trial.

(2)   Petitioner's statement was the product of threats made by police, in violation of his constitutional rights.

(3)   Petitioner was denied his right to an impartial jury.

(4)   Denial of effective assistance of counsel.

6

(5)  Petitioner's right to due process was violated by
     prosecutorial misconduct.

(6)  Petitioner's right to due process was violated by improper
     jury charge concerning conspiracy.

(7)  Petitioner's right to due process was violated by improper
     jury charge concerning attempt.

(8)  The trial court should have charged the affirmative defense
     to felony-murder as to Petitioner.

(9)  Trial judge's deficient instructions concerning accomplice
     liability deprived Petitioner of his due process rights.

(10) Trial judge's instruction on felony-murder denied Petitioner
     his right to a fair trial.

(11) Denial of effective assistance of counsel when counsel did
     not obtain an expert witness concerning cause of death.

(12) Defense counsel's conflict based upon his daughter's
     employment in the Passaic County Prosecutor's Office denied
     Petitioner his effective counsel and due process rights.

(13) Denial of effective assistance of counsel to prepare
     Petitioner for hearing and trial, failure to convey plea
     bargain, and for refusing to allow Petitioner to testify.

(14) Aggregate errors in pretrial and trial procedure, and
     effective assistance, denied Petitioner his right to a fair
     trial.

(Petition, ¶ 12).

7

It appears that the claims have been exhausted in the state courts.  Nonetheless, this Court finds that Petitioner's claims are clearly meritless.  Thus, the petition will be denied.[2]

## DISCUSSION

### A.  Standards Governing Petitioner's Claims.

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[2]  Although a petition for writ of habeas corpus may not be granted if Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding Petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. See id. at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of

9

inferior federal courts.  See Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

## B.   Prosecutorial Misconduct Claims (Grounds 1 and 5).

Petitioner claims in Ground 1 that the prosecutor's use of the word "thugs" to describe Petitioner and the witness who was being questioned resulted in unconstitutional misconduct. Further, Petitioner argues that the prosecutor impermissibly stated in his summation that the trial court endorsed the State's

medical examiner witness, Dr. Perez.  The prosecutor stated that "[Dr. Perez] knew what she was talking about and Judge Marmo agreed she did."

In Ground 5, Petitioner claims that the State's mishandling and destruction of evidence concerning the toilet bowl constituted prosecutorial misconduct, because the medical examiner was not able to measure the toilet rim to determine whether or not the victim may have fallen and received his deadly injuries from that fall, rather than the actions of Petitioner.

The Appellate Division examined each of these claims and found them without merit.  As to the claim regarding the "thugs" comment by the prosecutor, the Appellate Division stated:

> We are entirely satisfied that defendant was not prejudiced by the prosecutor's conduct of the trial. However, our disposition of this issue does not constitute a blanket endorsement of the prosecutor's methods.  The prosecutor improperly referred to defendant and Abdul as "thugs" during his direct examination of Ayoub.  Such derogatory name-calling is beneath the dignity of the prosecutor, and has often been disapproved by the Supreme Court . . . .  The trial court's prompt intervention and curative charge nevertheless obviated any potential for undue prejudice.

State v. Sheika, 337 N.J. Super. 228, 249-50 (App. Div. 2001)(internal string citation omitted).  With regard to the claim concerning the prosecutor's comment in summation that the trial judge endorsed the State's medical examiner's conclusions, the Appellate Division found:

The prosecutor also erred in his summation when he suggested that the trial judge endorsed the testimony of the State's expert, Dr. Perez. The judge's preliminary finding that Perez was qualified to offer an opinion concerning the cause of Ferguson's death obviously did not constitute an endorsement of the witness's testimony. The prosecutor's suggestion that the judge vouched for the credibility of the expert was factually incorrect and highly improper. We nevertheless find no prejudice flowing from this brief and isolated incident. At the time that the judge found Perez to be qualified, he specifically told the jury that it was not bound by the witness's opinion testimony and that it could reject it if it wished. This charge was essentially repeated in the judge's instructions at the conclusion of the case.

Id. at 250.

The United States Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. ... Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935). "The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone. Prosecutors sometime breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence." United States v. Young, 470 U.S. 1, 7 (1985).

12

Where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).  In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel.  See Darden, 477 U.S. at 181-82.  Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

In this case, this Court has reviewed the relevant record, the challenged remarks, and the state court's decision.  The prosecutor's comments challenged by Petitioner were not so offensive as to infect the entire trial, violate due process, or render his conviction unfair.  There was sufficient evidence to convict Petitioner, including Petitioner's confession, which was weighed by the jury.  In light of the entire trial and with the evidence against Petitioner, the Court is satisfied that the

prosecutor's allegedly offensive actions did not violate Petitioner's right to a fair trial.

Further, even assuming that the prosecutor's remarks were improper, the judge's curative instructions and jury charge were clear and correct and prevented the prosecutor's remarks from so infecting the trial with unfairness as to make the resulting conviction a denial of due process.

Finally, Petitioner has not demonstrated that the decision of the state courts was either contrary to or an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on these claims.

## C.   **Claim that Confession was the Result of Unconstitutional Conduct (Ground 2).**

Petitioner argues that his statement was made as a direct result of fear and threats made by the police, and that as a result, his statement was involuntarily given in violation of his Fifth Amendment right not to give evidence against himself.

The circumstances surrounding Petitioner's incriminating statement were evaluated at a pre-trial <u>Miranda</u> hearing.  The Appellate Division set forth the relevant facts as follows:

> Sergeant Raymond Reid and Detective Timothy Jordan testified for the State.  Both officers related that they arrested defendant on June 8, 1992, and that they apprised him of his constitutional rights while he was being transported to police headquarters.  After indicating that he understood his rights, defendant expressed his awareness of Ferguson's robbery, but denied any involvement.

14

The interrogation continued at the police station. For the first time, Reid informed defendant of Ferguson's death.  Shortly after this revelation, defendant agreed to give a statement.  Defendant was again advised of his constitutional rights.  Before giving a written statement, defendant signed a formal waiver.  The statement took approximately two hours to complete.  Reid testified unequivocally that no threats were made and that none of the officers present displayed a weapon during the questioning.

Jordan's testimony essentially mirrored that of Reid.  Specifically, Jordan testified that defendant became visibly upset after being apprised of Ferguson's death.  At that point, defendant agreed to sign a formal waiver of his rights and to provide a written statement.  Like Reid, Jordan was questioned on cross-examination as to whether any threats were made or force employed in order to obtain a confession. Jordan adamantly denied any suggestion that defendant was coerced.  Jordan could not recall whether Captain William Buckley was present when defendant was questioned. When asked if he "recalled whether Buckley took his gun out ...  and placed it on the desk in front of [defendant] ...  at any stage [of the interrogation,]" Jordan responded that he "did not."

Defendant testified that he was not apprised of his constitutional rights until after he gave the written statement.  According to defendant's testimony, Captain Buckley unholstered his gun and placed it on the desk while threatening to "beat [him] up if [he] did not tell him" the whereabouts of Ferguson's medallion.  Defendant claimed that Buckley again threatened him when he continued to refuse to confess. Defendant testified that he ultimately succumbed to Buckley's threats and gave a written statement. He asserted that he first learned that Ferguson had died only after giving his written statement.

State v. Sheika, 337 N.J. Super. 228, 237-38 (App. Div. 2001).

With regard to the legal aspects of the hearing, the Appellate

Division held:

In denying the motion to suppress, the trial judge emphasized that he believed the testimony of Reid and

Jordan and found defendant's account to be incredible.
The judge found specifically that Buckley never
displayed his weapon or otherwise threatened defendant
during the interrogation.  The judge determined that
defendant was advised of his rights while being
transported to police headquarters, that he was
readvised at the police station before signing the
written waiver, that the officers informed him of
Ferguson's death prior to his confession, and that the
written statement was voluntarily given.

     The trial judge's factual findings are supported
by substantial credible evidence present in the record.
We are obliged to defer to the trial judge's
credibility determination to the extent that it was
grounded in the court's opportunity to observe the
character and demeanor of the witnesses, an opportunity
that we appellate judges are not afforded.  It cannot
fairly be said that the trial judge went wide of the
mark in his determination that the State had sustained
its burden of proof respecting the question of
voluntariness.

Id. at 238-39 (internal citations omitted).  However, the

Appellate Division continued, expressing concern that the State

did not call Buckley or other additional witnesses who may have

rebutted Petitioner's claims of coercion, or otherwise shed light

on the case.  See id. at 239.  The Appellate Division noted that

in other states, there is a rule that "whenever an accused offers

testimony that his confession was induced by violence, threats or

coercion, the prosecution has the burden to produce all material

witnesses who were connected with the controverted incriminatory

statement or give an adequate explanation for their absence."

Id. (citations omitted).  However, the court declined to adopt

that rule for New Jersey, see id. at 240, and held that "the

16

State presented overwhelming evidence that defendant's confession was voluntarily given" and properly admitted into evidence, id.

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination.  See Malloy v. Hogan, 378 U.S. 1, 8 (1964).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation ... contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  When police ask questions of a suspect in custody without administering the required warnings, Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief.  See Oregon v. Elstad, 470 U.S. 298, 317 (1985).  Thus, a confession taken during a custodial interrogation without the provision of Miranda warnings violates the privilege against self incrimination.  See Thompson v. Keohane, 516 U.S. 99 (1995).

"To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the Miranda Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be

used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." <u>Thompson</u>, 516 U.S. at 107; <u>see</u> <u>also</u> <u>Miranda</u>, 384 U.S. at 479.  The <u>Miranda</u> Court outlined the procedures to be followed after the police provide these warnings.  If the accused requests counsel, then "the interrogation must cease until an attorney is present." <u>Miranda</u>, 384 U.S. at 474.

Petitioner's allegation that the trial judge erred in denying the <u>Miranda</u> motion lacks merit.  The state courts invoked the correct law, held a pretrial hearing, and reasonably determined the facts in light of the evidence presented.  Based on a review of the record, including the pretrial <u>Miranda</u> hearing, this Court can fathom no reason to upset the findings of the state court.  <u>See</u> <u>Fahy v. Horn</u>, 516 F.3d 169, 196 (3d Cir. 2008) (state court decision to reject petitioner's request for suppression was not "contrary to" Supreme Court precedent, as state court adhered to the correct standard; further, "the suppression court was entitled to make the credibility determination that it did in the face of conflicting testimony, and it applied the correct law to its findings of fact and came to a reasonable conclusion").  This claim for habeas relief will be denied.

D.    **Claim that Petitioner was Denied his Right to Impartial Jury (Ground 3).**

Petitioner argues that there were jurors on his panel that he did not want to sit, and that counsel did not challenge them although instructed to do so by Petitioner.  In particular, the jurors Petitioner did not wish to sit on the trial were individuals who knew, or were related to, firemen or police officers.

Under federal law, a criminal defendant has a right to an impartial jury pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.  The right to an impartial jury is applicable to the States through the Fourteenth Amendment. See Morgan v. Illinois, 504 U.S. 719, 726 (1992).  Even though the Constitution requires an impartial jury, the Supreme Court has not dictated bright-line rules for the adequacy of the voir dire.  Absent allegations of racial or ethnic bias or a capital punishment issue, the Supreme Court consistently has held that trial judges in criminal matters are afforded substantial discretion in determining whether a juror is fit to make an unbiased determination.  See Risatano v. Ross, 424 U.S. 589, 595 (1976); and Mu'min v. Virginia, 500 U.S. 415, 422 (1991).  Trial judges are afforded such discretion because "the determination of impartiality, in which demeanor plays such an important part, is particularly in the province of the trial judge." Risatano, 424 U.S. at 594.  Furthermore, jury selection is a factual

19

determination made by the trial judge, and therefore is subject to a presumption of correctness during federal habeas review. See Wainwright v. Witt, 469 U.S. 412, 428 (1985); and 28 U.S.C. § 2254(e)(1).

Here, Petitioner does not demonstrate that his jury was impartial.  In fact, despite these jurors ties to law enforcement, the jury acquitted him of first-degree robbery, and acquitted his co-defendant of felony murder and first-degree robbery.  Additionally, Petitioner's attorney did not raise any objections to the jury panel during trial, and the record does not show any instance where Petitioner complained of the make-up of the jury.

Thus, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the decisions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Petitioner's claim will be denied.

**E.   Ineffective Assistance of Counsel Claims (Grounds 4, 11, 12, 13, 14).**

In Ground 4, Petitioner argues that counsel's concession to the robbery denied him his right to effective assistance of counsel.  He also argues that he never agreed to this strategy

with counsel, that his desired position was to advance that the statements were coerced, that no medical expert was called by counsel, and that the concession to the robbery contributed to the felony-murder conviction and removed from the jury the duty to find him guilty beyond a reasonable doubt.

In Ground 11, Petitioner argues that counsel was ineffective for failing to obtain an expert witness concerning cause of death.  At the post-conviction relief hearing, an expert for Petitioner testified that he would not classify the victim's death as a homicide, but rather an as accident resulting from the fall in the bathroom.  Petitioner feels that this matter should have been brought before the jury at trial for findings of fact.

In Ground 12, Petitioner argues that he received ineffective assistance of counsel because his trial attorney's daughter worked for the Passaic County Prosecutor's Office as a Senior Assistant Prosecutor at the time of the trial.  He states that if he had known that, he would have hired a different attorney, and that he did not find out until after the trial.  The Appellate Division examined Petitioner's claim that counsel was conflicted because of this relationship and remanded the matter back to the trial court for an evidentiary hearing.  The daughter testified at the evidentiary hearing, and the trial judge found that the claim had no merit, based on credibility determinations.

In Ground 13, Petitioner argues that counsel failed to adequately consult with him and prepare him for the <u>Miranda</u> hearing and the trial, failed to convey a plea bargain, and refused to permit Petitioner to testify at trial.

In Ground 14, Petitioner argues that because of numerous errors, Petitioner was denied of his right to effective counsel.

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Under <u>Strickland</u>, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  <u>See</u> <u>id.</u> at 688-89; <u>Jacobs v. Horn</u>, 395 F.3d 92, 102 (3d Cir. 2005); <u>Keller v. Larkins</u>, 251 F.3d 408, 418 (3d Cir.), <u>cert. denied</u>, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Strickland</u>, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  <u>Id.</u>  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy

22

> for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable.  A fair
> assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the
> conduct from counsel' s perspective at the time.
> Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption
> that counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be
> considered sound trial strategy."

Id. at 689 (citations omitted); see also  Virgin Islands v.

Wheatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S.

1020 (1996).

If able to demonstrate deficient performance by counsel, the

petitioner must also show that counsel's substandard performance

actually prejudiced his defense.  See Strickland, 466 U.S. at

687.  Prejudice is shown if "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability

is a probability sufficient to undermine confidence in the

outcome."  Id. at 694.  The reviewing court must evaluate the

effect of any errors in light of the totality of the evidence.

See id. at 695-96.  Thus, the petitioner must establish both

deficient performance and resulting prejudice in order to state

an ineffective assistance of counsel claim.  See id. at 697; see

also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

Petitioner's ineffective assistance of counsel claims were reviewed by the Appellate Division.  The Appellate Division remanded the issues to the PCR court for an evidentiary hearing. The evidentiary hearing, which was extensive and included three State witnesses and 12 defense witnesses, was held over the course of eleven months, from December 2001 to November 2002. See State v. Sheika, A-2798-02T2 (App. Div. Nov. 17, 2004).  At the conclusion of the hearings, the judge denied the PCR application in an extensive oral opinion.  Petitioner appealed the decision to deny PCR to the Appellate Division, which affirmed.  See id.  Petitioner's ineffective assistance of counsel claims raised in this petition were raised in that PCR petition.

As to Petitioner's Ground 4, concerning the concession of the robbery charge, the Appellate Division rejected the claim based on trial strategy, stating:

> . . . [Defense counsel] made a legitimate strategic decision to admit the robbery in light of defendant's detailed confession to the robbery and attack on Ferguson. [Defense counsel] could lose credibility with the jury if he contested commission of the robbery and then the jury was confronted with the State's strong evidence that the robbery occurred. [Defense counsel] understood that Sheika's confession was strong evidence against his client.

Id. at p. 33.

24

As to Petitioner's Ground 11, the Appellate Division found that Dr. Baden's testimony concerning the cause of death, presented at the PCR hearing, was insignificant, stating:

> The [PCR] judge did not find that Dr. Baden's testimony constituted newly-discovered evidence, as it equally was available in 1994.  The judge did not believe his testimony would have created a different result at trial.  The judge saw Dr. Baden as "in a position inferior to that of Dr. Perez because Dr. Baden did not perform the autopsy and did not see the curvilinear bruise which appeared after the body was refrigerated."  The judge stated that cross-examination of Dr. Baden showed he was incorrect to argue there was a lack of certain symptoms manifested by Ferguson after the mugging.  Either such symptoms indeed were present or Dr. Baden was not in a position to conclude they were absent.  Such symptoms included Ferguson holding his kidney, needing help to the car, and needing help to remove his shoes.

> In sum, the judge did not believe defendant's trial counsel was unprepared for Dr. Perez's testimony, or that trial counsel was deficient when he did not call an expert to testify.  In his brief, defendant does not address the PCR judge's findings, but flatly states that there is a reasonable probability the result would have been different had a defense expert testified.  Defendant does not address the PCR testimony that Dr. Zigibe was consulted and gave an unfavorable opinion.  Defendant also does not address the inadequacies with Dr. Baden's PCR testimony which the judge identified.  For these reasons, we reject [Petitioner's contentions].

Id. at pp. 56-57.

As to Petitioner's Ground 12, the Appellate Division detailed the PCR judge's findings, noting, in part:

> The PCR judge made detailed findings as to the alleged conflict of interest.  He found that [defendant's attorney], defendant's trial counsel, and [counsel's daughter], who worked as an Assistant Prosecutor at the time of trial, were father and

25

daughter.  He found they never had a professional
relationship or shared an economic interest.  The judge
found they lived in separate households, and there was
no evidence [the daughter] "had any involvement at all
with this case."  The judge found no evidence that [the
daughter] had any confidential information from the
defense side, or vice versa.  The judge observed there
was no claim as to any confidential information the
State had, and that discovery rules allow the defense
to see the State's entire file.

Id. at p. 37.

As to Ground 13, regarding Petitioner's claim that counsel

was ineffective for failure to consult, prepare, convey a plea

bargain, and permit defendant to testify, the Appellate Division

noted, in part:

The next issue the judge had to consider was
whether defendant's trial counsel was ineffective for
failing to inform defendant of the right to testify . .
.   The judge found [defense counsel's] testimony
credible on this point and defendant's testimony not
reliable.  The judge found untruthful defendant's claim
that he wanted to testify and [counsel] prevented him.
The judge believed it "inconceivable" that defendant
would have remained silent as the defense rested and
not express a desire to testify.  The judge found it
more inconceivable that defendant would have sat
through the charge conference and said nothing,
especially where there was discussion of defendant's
election not to testify.

Id. at pp. 40-41.

As to Petitioner's claim concerning counsel's consultation

with Petitioner, the Appellate Division relayed:

. . . As to whether trial counsel adequately consulted
with defendant, the judge did not find any facts to
support this argument.  He said:

The bottom line here is that there is no evidence
that has been presented that there was anything

26

> lost to the defendant because of a lack of
> communication with his attorney.  There is no
> evidence presented at these hearing s that there
> was some information that the defendant had at
> that time which the defendant could have passed on
> to his attorney that might have been useful as a
> defense and that was lost as a result of a lack of
> communication between the attorney and the client.
>
> Consequently, there is no reason to believe
> that there is a likelihood that the result
> would have been different if not for better
> communication between the attorney and his
> client.

Id. at pp. 42-43.  Likewise, as to the claim that defense counsel

did not convey any plea offer, the Appellate Division held:

> . . . It appears this is the first time defendant makes
> this claim.  He bases his argument on PCR testimony
> from [co-defendant's counsel].  Defendant says [co-
> defendant's counsel] testimony shows a plea offer was
> made, but [defense counsel] never informed defendant of
> the offer.  Considering the PCR judge's overall
> distrust of defendant's testimony and defendant's
> failure to make a substantial issue out of this claim
> at the trial level, we reject this argument.
> Defendant's PCR counsel did not even mention anything
> about a plea agreement in his closing arguments.

Id. at p. 43.

It is important to note that the state courts correctly

cited and analyzed Petitioner's claims utilizing the Strickland

standard.  See, e.g., State v. Sheika, 337 N.J. Super. 228, 241-

42 (App. Div.), certif. denied, 169 N.J. 609 (2001).

Further, a review of the record shows that counsel was

competent and did not perform deficiently.  Evidence at trial

against Petitioner included Petitioner's own confession that he

participated in the robbery and may have kicked the victim while

27

taking the victim's gold chain and medallion.  Petitioner told police that he gave the medallion to his girlfriend, and his girlfriend later brought the medallion to the police station at Petitioner's request.

As to admitting Petitioner's role in the robbery, the actions of counsel could be attributed to sounds trial strategy, in light of Petitioner's confession.  As set forth in the record, especially the oral decision of the PCR judge, counsel performed competently given the circumstances of the case.

Therefore, as the record reveals that the state courts relied on the <u>Strickland</u> standard in evaluating Petitioner's ineffective counsel claims, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the decisions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Petitioner's claims will be denied.

**F.   <u>Jury Charge Claims (Grounds 6, 7, 8, 9, and 10).</u>**

Petitioner claims that his constitutional rights were violated by improper jury charges concerning conspiracy (Ground 6), attempt (Ground 7), accomplice liability (Ground 9), and felony-murder (Ground 10).  He also argues that the trial court

should have charged the affirmative defense to felony-murder as to Petitioner (Ground 8).

The Appellate Division examined Petitioner's claims on direct appeal as to the jury charges, finding them without merit, and commenting only on Petitioner's claims regarding Ground 8 (statutory defense to felony-murder) and Ground 9 (accomplice liability).  The Appellate Division found:

> We also reject defendant's argument that the trial court erred by failing to instruct the jury of the statutory defense to felony murder set forth in N.J.S.A. 2C:11-3a(3).  That statute reads in pertinent part:

> [I]t is an affirmative defense that the defendant:

> (a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

> (b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and

> (c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

> (d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

> The evidence did not support the thesis that defendant was not a direct participant in the commission of the homicidal act.  Beyond this, defendant did not submit a request to charge on the subject. Nor did he interpose a timely objection to the instructions given.  To the contrary, during the charge

29

conference, the defendant's attorney acceded to the
trial court's decision to charge the statutory defense
as to Abdul, but not as to defendant.  The error
belatedly claimed here did not have the capacity to
lead to an unjust result.  Nor was the alleged error of
such moment as to "'cut mortally into the substantive
rights of the defendant [ ].'"

Finally, we are unpersuaded by defendant's claim
that the trial court's charge on accomplice liability
constituted plain error.  The trial of this case took
place before our decision in State v. Bielkiewicz, 267
N.J. Super. 520, 528, 632 A.2d 277 (App. Div. 1993) was
rendered.  Using the Model Charge in effect at the
time, the trial court told the jury that "one cannot be
held to be an accomplice unless [it is found] that he
possessed the same criminal state of mind that is
required to be proved against the person who actually
committed the criminal act."  This was the instruction
we criticized in Bielkiewicz.  We are nonetheless
satisfied that the error was not harmful because the
evidence was overwhelming that defendant harbored the
requisite *mens rea* necessary to establish felony
murder.  Moreover, the trial court instructed the jury
that it was to consider "[e]ach offense and each
defendant ... separately."  We are satisfied that
defendant was not prejudiced.

State v. Sheika, 337 N.J. Super. 228, 250-52 (App. Div.), certif.

denied, 169 N.J. 609 (2001)(internal citations omitted).

Generally, a jury instruction that is inconsistent with

state law does not merit federal habeas relief.  Where a federal

habeas petitioner challenges jury instructions given in a state

criminal proceeding:

. . .  the only question for us is "whether the ailing
instruction by itself so infected the entire trial that
the resulting conviction violates due process."  It is
well established that the instruction "may not be
judged in artificial isolation," but must be considered
in the context of the instructions as a whole and the
trial record.  In addition, in reviewing an ambiguous
instruction . . ., we inquire "whether there is a

30

> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution.  And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly."  "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73, (1991) (citations

omitted).  Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state

law."  Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997); see also

In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause

protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the

crime with which he is charged"); Sandstrom v. Montana, 442 U.S.

510, 523 (1979) (jury instructions that suggest a jury may

convict without proving each element of a crime beyond a

reasonable doubt violate the constitutional rights of the

accused).

In this case, this Court has reviewed the record, and notes

that there is no contention that the jury charge wrongly

described the burden of proof.  The state courts did not find any

error under state law with the charges, and this Court cannot

ascertain any error that would rise to the level of a

constitutional deprivation.

31

Further, a review of the record reveals that Petitioner has not demonstrated that his entire trial and conviction was so prejudiced by the charge as to violate the principles of fundamental fairness and due process.  There was ample evidence against Petitioner to justify his conviction, including Petitioner's own statements.  Petitioner's conviction was based on a credibility determination by the jury, who chose to believe the state's witnesses over Petitioner's version of events. Petitioner's conviction was neither fundamentally unfair, nor violated due process.  This ground for relief will be denied.

## CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Accordingly, no certificate of appealability will issue.

## CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, is denied.  The Court further finds that no certificate of appealability will issue because Petitioner has not made a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253.

An appropriate Order accompanies this Opinion.

S/ Faith S. Hochberg
FAITH S. HOCHBERG
United States District Judge

Dated: June 15,2010